IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID L. SEGERS, | ) | Case No. 5:16-cv-2017 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.     Introduction

Plaintiff, David L. Segers, seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his application for disability insurance benefits ("DIB"), and a period of disability under Title II of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ supported his decision with substantial evidence and made no error in his application of law, I recommend that the final decision of the Commissioner be AFFIRMED.

## II.     Procedural History

Plaintiff protectively filed an application for DIB on May 16, 2013.  (Tr. 162)  Mr. Segers alleged his disability began on September 25, 2012.  (Tr. 92)  Plaintiff's application was denied initially on July 3, 2013 (Tr. 82) and upon reconsideration on October 24, 2013.  (Tr. 95) Plaintiff requested a hearing on November 7, 2013.  (Tr. 102)  Administrative Law Judge Michael Hazel conducted a video hearing on January 26, 2015.  (Tr. 10, 26)  On April 30, 2015,

the ALJ denied Mr. Seger's claims for benefits.  (Tr. 10-17)  The Appeals Council denied review of the ALJ's decision on June 9, 2016, rendering the ALJ's April 30, 2015 decision the final decision of the Commissioner.  (Tr. 1-4)

### III.    Evidence

#### A.    Personal, Educational, and Vocational Evidence

Segers was 58 years old on the date of the hearing.  (Tr. 32)  He had a high school education.  (Tr. 32-33)  He had past work experience as a telephone salesman at Summit Racing Equipment. (Tr. 34)

#### B.    Medical and Opinion Evidence

Plaintiff has been blind in his left eye since birth. He was told that his optic nerve had likely been damaged when he was born.  (Tr. 40)  Plaintiff can see general shapes with his left eye, but no definition.  (Tr. 40)  Testing of vision in his left eye has returned results between 20/200 and 20/400. (Tr. 323, 295, 367, etc.)

In 2012, plaintiff suffered a detached retina in his right eye.  On September 27, 2012, Dr. Estafanous performed a pars plana vitrectomy with retinal detachment repair of plaintiff's right eye.  (Tr. 311, 312)  On October 30, 2012, plaintiff had a follow up appointment with Dr. Sophia Pachydaki.  Dr. Pachydaki reported that plaintiff was doing well after his surgery and that his retina remained completely attached in the right eye.  Plaintiff reported that he was having a hard time seeing through the silicone oil and Dr. Pachydaki told him that the oil would be removed after his next visit in two months. (Tr. 399)

Plaintiff met with Dr. Pachydaki again on January 2, 2013.  She continued to note that he was doing well after his surgery and she scheduled an appointment for oil removal from his right eye. (Tr. 398)  The silicone oil removal procedure was performed on January 5, 2013.  (Tr. 314)

On March 11, 2013, the vision in plaintiff's right eye was 20/60. (Tr. 394) Dr. Pachydaki noted that plaintiff's vision was improved; his retina was flat and stable. (Tr. 394)

Plaintiff completed a functional report on May 30, 2013. (Tr. 231-238) Plaintiff stated that he was unable to focus continuously, to read, and to do some other tasks. It depended on the font size, color, backgrounds, etc. as to how much he was able to see. (Tr. 231)

Plaintiff's non-attorney representative completed a disability report on September 19, 2013. (Tr. 241-256) She stated that plaintiff's condition had worsened; that he had poor balance; used the railing when climbing stairs; poor concentration and focus. Plaintiff's eyes tired easily and it took him much longer to perform any type of task due to his lack of vision. (Tr. 241) Plaintiff reported that he used his computer for reading, but relied on high contrast, enlarged print and his reading glasses. (Tr. 248) Plaintiff also reported that he had difficulty doing some basic activities like eating, shaving, clipping his toenails, etc. He used his fingers to feel where he should shave or trim his toenails. (Tr. 249)

On January 7, 2014, plaintiff met with Dr. Leonard D. Tamburro at Portage Family Practice. (Tr. 376) Dr. Tamburro documented a discussion about how plaintiff's sight was affecting his ability to do any work. Plaintiff had reported that he couldn't "read well, especially computer screens." (Tr. 377)

Plaintiff's vision improved a little and Dr. Pachydaki told plaintiff to be examined for new glasses. So, plaintiff met with Lawrence M. Ronning, a board-certified ophthalmologist on January 8, 2014. Plaintiff reported that his near vision had not improved. (Tr. 406) In April 2014, Dr. Ronning noted that plaintiff was having visual changes probably related to his retinal status, which was stable at the time. (Tr. 404)

Cheryl Reed, O.D., COMS, performed a low vision assessment of plaintiff on July 24, 2014. (Tr. 416-418)  Dr. Reed noted that plaintiff was eager to obtain employment.  However he had discontinued driving at night and had problems reading small print.  He met the vision requirements for driving in daylight conditions and had resumed driving in March 2013. (Tr. 427)  Plaintiff reported hobbies of hiking, yard work, and bicycling. (Tr. 427)  Dr. Reed noted that plaintiff described fluctuating vision and visual aura.  Sometimes he saw a dark ring, falling raindrops, or an image resembling a bar code.  Dr. Reed theorized that these phenomena were due to spontaneous firing of damaged neural cells, migraine phenomenon or Charles Bonnet syndrome.  (Tr. 417)  Dr. Reed noted that plaintiff could read for 10-15 minutes and then a grey curtain or blinking started. (Tr. 427)  She felt that he was not using his progressive lenses correctly and did not feel comfortable wearing his glasses full-time, even though he "should wear glasses full time for protection." (Tr. 417)   Dr. Reed noted that his major visual goals were to improve lighting and decrease fatigue.  (Tr. 427)

Dr. Reed introduced plaintiff to a desktop closed circuit television and magnifiers to help with his vision issues.  She made several different recommendations regarding tools and magnifiers that would assist plaintiff if he were able to return to work.  (Tr. 416-421)  She also recommended wearing two pairs of single vision glasses and that when he needed to see detail at a distance he could use binoculars.  (Tr. 417-418)

Plaintiff met with Dr. Pachydaki on November 5, 2014.  (Tr. 456)  She felt that he had benefitted from the low vision assessment with Dr. Reed, but only for distance. (Tr. 456)  Plaintiff's vision was 20/50 in the right eye.  He complained that his vision was getting worse following his last exam; that he was seeing shadows, halos, flashes of light, and a "curtain" in his right eye. (Tr. 462)

4

Plaintiff met with Dr. Ronning on November 6, 2014. (Tr. 433)  Dr. Ronning also continued to document various complaints from plaintiff regarding his vision.  He complained of seeing a black round ring. (Tr. 433)

Following the administrative hearing, plaintiff submitted a log of notes he had taken regarding his vision problems.  He entitled this submission "Inconsistent Vision Log."  (Tr. 282) In the log, plaintiff described seeing white spots, flashing scan codes, gray curtains, etc., on various days throughout the time period from October 22, 2014 through January 28, 2015. (Tr. 282-288)

### C.     Opinion Evidence

#### 1.     State Agency Reviewing Physicians

Lynne Torello, M.D. reviewed plaintiff's records on July 1, 2013 and opined that he had no exertional limitations.  She opined that he should never climb ladders, ropes or scaffolds.  She indicated that he had the following visual limitations:  his near acuity, far acuity, depth perception, accommodation, and field of vision were limited in his left eye.  She opined that plaintiff should avoid all exposure to hazards including machinery and heights. She also indicated that he should not perform any commercial driving.  (Tr. 60-62)

Leon D. Hughes, M.D., reviewed plaintiff's records on October 23, 2013 and affirmed the opinion expressed by Dr. Torello. (Tr. 72-75)

#### 2.     Consultative Examination – October 2013

On October 21, 2013, plaintiff met with Dr. Steven Rogers for a consultative examination. (Tr. 366-368)  Dr. Rogers' impression was that plaintiff had suffered acute vision loss in his right eye with a history of detached retina.  He also noted congenital blindness in his left eye.  Dr. Rogers stated that his assessment of plaintiff's ability to work included no

musculoskeletal limitations.  Plaintiff had no difficulty maneuvering into the room. (Tr. 367)  He

had no limitations with his hearing, speech, or use of his hands.  His ability to pick up a coin or

key; to write; to hold a cup; open a jar; button/unbutton; zipper and open a door were all intact.

(Tr. 370)  However, Dr. Rogers stated that plaintiff had significant vision loss with 20/200 vision

in the left eye and 20/50 vision in the right. (Tr. 367)

### D. Testimonial Evidence

#### 1. Plaintiff's Testimony

At the January 26, 2015 hearing, Mr. Segers offered the following testimony[1]:

- He is five feet ten and a half inches.  (Tr.32)

- At the time of the hearing he weighed 265 pounds. (Tr. 32)

- Plaintiff had completed high school and taken some courses in college, but he had not earned a college degree. (Tr. 33)

- Plaintiff was able to drive during the daytime.  He didn't drive at night or on bright, sunny days. After his retina detached, he did not drive for six months. (Tr. 32)

- Plaintiff was able to read but he had problems because of changes to his vision since his detached retina was repaired.  For example, he often saw a dark black ring with a bright white background in it, or a gray curtain that fell down over his eye, or a rain sensation.  These vision problems did not last all day, but often occurred if he read for more than 20 minutes.  Certain days were worse than others.  Plaintiff could read on his iPad longer than he could read a regular book.  (Tr. 33, 38-39)

- Plaintiff worked for many years at Summit Racing Equipment.  He last worked on September 25, 2012.  His employer continued his benefits in the hope that he would be able to return to work after his second surgery in January 2013.  However, after the second surgery, plaintiff's physician was not sure when he would be able to return to work, so his employment officially ended at that time. (Tr. 34)

- At Summit Racing, plaintiff sat at a computer and took calls from customers.  He was required to look up parts in catalogues and on the computer and to place customers' orders.  He worked nine hour days and spent most of his time sitting at a desk, talking

---

[1] I am only summarizing the portions of Seger's testimony relating to his vision and employment issues, because those are the only matters he has raised in this action.

on the telephone.  Plaintiff mostly received incoming calls or returning missed calls. He did not do outside sales.  (Tr. 35)

- Plaintiff's impairment was related to his vision.  He had depth perception problems making it difficult for him to navigate stairs. He had trouble seeing if the lighting was not good.  His vision was inconsistent.  (Tr. 37) Plaintiff did not have significant problems with distance vision.  His vision problems were related to the area within his reach.  (Tr. 41)

- Plaintiff had a couple of different pairs of glasses that he wore to assist him in reading and in reducing glare when he drove.  (Tr. 37-38)

- Plaintiff had two surgeries on his right eye.  The first surgery was September 27, 2015.  The second surgery was in January 2013 to remove oil from the first surgery. (Tr. 38)

- Plaintiff did not have any mental impairments or other physical problems that would prevent him from working. (Tr. 41)

- Plaintiff was able to do household chores, dishes, laundry and yard work at home.  He was not always able to see details, so when he swept the floor or shaved his face, he missed spots.  (Tr. 45)

- Plaintiff was able to do grocery shopping but had some difficulty reading cans. (Tr. 45)

### 2.    Vocational Expert's Testimony

Vocational Expert ("VE") Gene Burkhammer offered the following testimony:

- The VE stated that, if he gave any opinions that conflicted with the DOT, he would advise the ALJ of the conflict and provide the basis for his opinion.  (Tr. 46)

- Plaintiff's past work was phone sales, which was a sedentary job.  (Tr. 47)

- The ALJ asked the VE to consider a hypothetical individual with the same education and work experience as plaintiff, who was limited to occasional lifting and carrying of 50 pounds and frequently lifting and carrying 25 pounds.  The individual was required to avoid climbing ladders and scaffolds; had no limitation on climbing ramps but should only occasionally climb stairs.  He was required to avoid exposure to operational control of moving machinery and unprotected heights.  The individual was required to avoid commercial driving; would not be expected to read fine print and was limited to work where the instructions could be given verbally or with written instructions that could be read in less than 20 minutes.  The individual was limited to reading print in low contrast to the background on the page, but could read

a newspaper up to 20 minutes and write in a setting similar to a typical office setting with lighting that was comparable to a typical office setting. (Tr. 47)

- The VE opined that this individual would be able to perform plaintiff's past work. He would also be able to perform the jobs of laundry laborer, order puller and dietary aid. The VE testified that there were a significant number of state and national jobs available for these positions. (Tr. 48)

- The VE testified that the jobs which this individual could perform required occasional visual acuity. If he could not use his near acuity at least occasionally, those jobs would be excluded. (Tr. 49-50)

- If the individual was limited to using his near visual acuity only 10% of the work day, he could not perform the jobs previously listed by the VE. However, the individual would still be able to perform the jobs of housekeeping cleaner, dishwasher or caretaker. The VE testified that there were a significant number of state and national jobs available for those positions. (Tr. 50-51)

## IV. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(a). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[2]....

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations:

1. If the claimant is doing substantial gainful activity, he is not disabled.

---

[2] "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." 42 U.S.C. § 423 (d)(2)(A).

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment,[13] claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987).  Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997).  The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

**V.      ALJ's Findings and Decision**

The ALJ issued a decision on April 30, 2015, issuing the following summarized findings:

1. Segers met the insured status requirements of the Social Security Act through March 31, 2018. (Tr. 12)

2. Segers had not engaged in substantial gainful activity since September 25, 2012, the alleged onset date.  (Tr. 12)

3. Segers had the following severe impairments:  left eye blindness and status-post retinal detachment and repair of the right eye. (Tr. 12)

4. Segers did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  (Tr. 13)

5. Segers had the residual functional capacity ("RFC") to perform a range of work at all exertional levels but with the following nonexertional limitations: he could never climb ladders or scaffolds; could occasionally climb stairs; was required

9

to avoid all exposure to operational control of moving machinery, unprotected heights and hazardous machinery. He could never perform commercial driving or read fine print. He was required to receive any instructions verbally or in writing that could be read in under 20 minutes at a time. He could read newsprint for up to 20 minutes at a time; could perform writing in a setting with lighting similar to that of a typical office environment and could only occasionally perform near visual acuity. (Tr. 13-15)

6. Segers was able to perform his past relevant work as a telephone salesperson. (Tr. 16)

Based on these findings, the ALJ determined that Segers was not under a disability since September 25, 2012, the alleged onset date. (Tr. 17)

## VI.  Law & Analysis

### A.  Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762,

10

772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535,545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached." *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

The court must also determine whether proper legal standards were applied. If not, reversal is required unless the error of law is harmless. *See e.g. White v. Comm'r of Soc. Sec.* 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.")

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue,* 774 F.Supp.2d 875, 877 (N.D. Ohio 2011) (*quoting Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); *accord Shrader v. Astrue,* No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue,* No. 1:10-cv-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue,* No. 2:10-CV-017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).

**B.      The ALJ's Hypothetical Question to the VE**

Plaintiff argues that the ALJ's hypothetical question to the VE was vague in regard to how long the person could read at one time.  Specifically, plaintiff argues that the ALJ's limitation that the hypothetical individual could read newsprint-size type for "up to 20 minutes" was vague.  Plaintiff surmises that the individual might be required to read 20 minutes one day, five minutes another, and only one minute a different day.  Plaintiff contends that, because the ALJ's question was vague, the VE's testimony did not provide substantial evidence for the ALJ's decision.[3]

In response, defendant argues that the plaintiff waived any objections to the VE's testimony because plaintiff's representative did not question the VE or ask for any clarification during the hearing.[4]  Defendant also argues that the ALJ's limitation of how long the hypothetical individual was capable of reading was not vague and that, even if it was, it was harmless error.[5]

Defendant relies on cases holding that a claimant's failure to raise an issue during the hearing precludes him from later asserting it as a basis for relief.  *See Luukkonen v. Comm'r of Soc. Sec.,* 653 Fed. Appx. 393, 405 (6th Cir. 2016); *Sims v. Comm'r of Soc. Sec.,* 406 F.App'x 977, 982 (6th Cir. 2011); *Harris v. Comm'r of Soc. Sec. Admin.,* 2012 U.S. Dist. LEXIS 136097 (N.D. Ohio, 2012).   However, in all of these cases, the claimants were represented by legal counsel.  Plaintiff contends that his case should be treated differently because his administrative hearing representative was not an attorney.[6]

---

[3] ECF Doc. 18, Page ID# 564-565.
[4] ECF Doc. 19, Page ID# 587.
[5] ECF Doc. 19, Page ID# 588-590.
[6] ECF Doc. 20, Page ID# 604-605.  However, plaintiff admits that his representative was from a large corporation that advertises that it "wins SSDI awards for 97% of customers."

After he questioned the VE, the ALJ asked plaintiff's representative whether he had questions for the VE.  The representative said no.  (Tr. 52)  Then plaintiff, though he didn't examine the VE, tried to clarify his earlier testimony regarding 20 minutes of reading.  (Tr. 52-53)  Because plaintiff was not represented by an attorney at the hearing, he arguably did not waive his right to challenge the VE's hypothetical question.  However, because the undersigned finds that the ALJ's hypothetical question was not vague and that plaintiff's argument is not persuasive, it is unnecessary to delve further into whether this argument was waived.

The reading-time limitations described in the hypothetical question to the VE were not vague.  The ALJ described the type of reading material ("newspaper print") and the specific range of time the hypothetical individual would be able to read – not more than 20 minutes at a time.  These limitations were specific and were gleaned from plaintiff's medical records and his administrative hearing testimony, when he said:

> [E]ver since the second surgery, I've had a - - or a dark black ring in front of my pupil, directly in front of my pupil that moves with my pupil with a bright white background in it and that affects my reading.  And then other things have happened such as I get a curtain when I start to read, a gray curtain that falls down where my eye - - and then I get this rain sensation falling from the top, and that is pretty much every day now.  It doesn't last all day.  But if I sit down to read a normal book, I can go approximately 20 minutes and then that rain gets so thick and full it blocks my vision and then I have to get up, go do something else, 10, 15 minutes.  I'm back and I can repeat that.  But certain days are worse than others.
>
> Q:  So how long can you read at one time?
>
> A:  About 20 minutes.  That would be a regular book.  Now like on the iPad, I can adjust the font size and there I can go about an hour before I get really fatigued and almost to the point that I can't stay awake.

(Tr. 33-34)  In his VE hypothetical, the ALJ specified the type of print and the specific length of time the individual would be able to read.  He also prohibited the reading of fine print.  This part of the ALJ's questioning appears to be consistent with the plaintiff's testimony, which the VE

13

also heard. The VE did not ask the ALJ to clarify the 20 minute reading restriction in the hypothetical question.  The undersigned finds that the hypothetical question was neither vague nor confusing.

The cases cited by plaintiff involving vague ALJ questioning are distinguishable.[7]  In *Gapen v. Comm'r of Soc. Sec.,* 2015 U.S. Dist. LEXIS 35834 (N.D. Ohio, 2015), the court refused to make a determination on the plaintiff's argument that the RFC assessment was impermissibly vague.  The court noted that the law was scarce regarding when a hypothetical question was impermissibly vague. The court also noted that the transcript was incomplete because the ALJ had been inaudible during portions of the hearing.   These factors made it very difficult to decide whether the ALJ's question had been vague.  The court had already determined that remand was necessary on other grounds.  Thus, it was not necessary for the court to determine whether the ALJ's hypothetical question was impermissibly vague.   Consequently, *Gapen* is of no precedential value on the issue of whether an ALJ's hypothetical question is impermissibly vague.

Plaintiff also cites *Scott v. Astrue*, 2012 U.S. Dist. LEXIS 127337 (N.D. Fla., 2012) and states that the *Gapen* court found the analysis in *Scott* to be helpful.  According to the *Gapen* decision, *Scott* held that a question that was subject to multiple interpretations may not provide substantial evidence to support an ALJ's decision.  However, other than indicating that the plaintiff had cited *Scott,* the *Gapen* decision contains no discussion of *Scott's* analysis and does not state that it was "helpful."   And, as noted above, the *Gapen* court refused to make any

---

[7] Plaintiff also cites case law holding that each element of a hypothetical must accurately describe the claimant. *See Hardaway v. Secretary of H.H.S.,* 823 F2d 922, 927-28 (6th Cir. 1987); *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994); *Varley v. Secretary of H.H.S.,* 820 F.2d 777, 779 (6th Cir. 1987).  Plaintiff re-cites these cases in his reply brief.  However, these cases do not involve vague hypothetical questions as argued by plaintiff in this case. The undersigned has not included a detailed discussion of these cases here because they are inapposite.

14

determination on the argument that the ALJ's hypothetical question had been impermissibly vague.

In *Scott,* a Florida district court determined that the ALJ's definition of the term "moderately limited" was vague, but also found that it appeared to conflict with an RFC finding that the plaintiff had some mental limitation.  The Commissioner's decision was remanded so that the ALJ could unambiguously *and accurately* include all of the plaintiff's limitations in the VE hypothetical.  *Id. at *27.  Scott* is distinguishable because the ALJ here provided specific details regarding Seger's limitations: that he could read newspaper-sized print for "up to 20 minutes."  These details were gleaned from plaintiff's testimony and did not omit other limitations evidenced in the record.

Plaintiff also relies on *Maynard v. Astrue,* 276 Fed. App'x 726, (10th Cir. 2007), in which the ALJ asked the VE to name some jobs "where you could sit or stand with [claimant's] skill levels."  The Tenth Circuit considered the VE hypothetical in light of the requirements of SSR 96-9p, which permits a sit-stand work option for sedentary work but also requires that the RFC assessment be "specific as to the frequency of the individual's need to alternate sitting and standing." *Id.* at 731.  Unsurprisingly, the Tenth Circuit determined that the VE hypothetical wasn't specific enough.  The ALJ simply asked for jobs that plaintiff could perform sitting or standing.  It was unclear whether the ALJ was even referring to a sit-stand option and there was no mention of any frequency of alternating between the two positions.  Because the VE hypothetical here was far more specific than the one posed in *Maynard*, that case is distinguishable.

Finally, plaintiff relies on the district court decision in *Cook v. Comm'r of Soc. Sec.,* 2016 U.S. Dist.LEXIS 11296 at *8-9 (W.D. Mich. 2016).  In *Cook,* the claimant testified that she

could walk for a maximum of fifteen to twenty minutes before she needed to sit down and rest for a few moments.  The ALJ posed a VE hypothetical in which a person would be prohibited from "prolonged walking."  The district court remanded the case because the term "prolonged walking" was not defined and it was unclear whether the ALJ was adopting plaintiff's subjective statements regarding her ability to walk.   Here, unlike *Cook*, the ALJ did not ask a hypothetical question in which the plaintiff was prohibited from "prolonged" reading.  Rather, the ALJ specifically limited the hypothetical individual to "up to 20 minutes" of reading "newspaper print."  The ALJ also prohibited the reading of "fine print."  (Tr. 47)  This question correlated with plaintiff's testimony regarding his ability to read.  As already noted, when asked directly how long he could read, plaintiff stated "about 20 minutes," with a regular book; and when he could adjust the font size on his iPad, he could read for about an hour.  The ALJ's VE hypothetical was not impermissibly vague and did not render the VE's testimony unreliable. Plaintiff's first argument is not well taken and the court should not reverse the ALJ's decision on this basis.

### C.  The ALJ's Reliance on the VE's Representation that his Testimony was Consistent with the DOT

Plaintiff next argues that the ALJ's reliance on the VE's testimony was misplaced because there was a discrepancy between the VE's testimony and the *Dictionary of Occupational Titles* ("DOT").  Plaintiff cites case law indicating that the Seventh, Ninth and Tenth Circuits have held that any inconsistency between the VE's testimony and the DOT results in reversible error.  *Sprouse v. Colvin,* 2016 U.S. Dist. LEXIS 142501 (W.D. Ky., 2016).

However, as pointed out by defendant, the Sixth Circuit has held that if the ALJ asks the VE whether the testimony is consistent with the DOT and the VE testifies that it is, the ALJ has satisfied his burden. *Lee v. Comm'r*, 529 Fed. App'x. 706, 715, (6th Cir. 2013).  Here, at the

outset of his testimony, the ALJ explained to the VE that he would be required to advise the ALJ of any conflict between his testimony and the DOT.  (Tr. 46)  At the end of the VE's testimony, he stated that his testimony was consistent with the DOT. (Tr. 53)  Thus, the ALJ satisfied his burden and was permitted to rely on the  VE's testimony.  *Lee,* 529 Fed. App'x at 715.

Moreover, it is questionable whether there was actually any inconsistency between the VE's testimony and the DOT.  Plaintiff's argument is based on two potentially inaccurate assumptions.  First, plaintiff points to the DOT's definition of "telephone solicitor" – plaintiff's past relevant work – and argues that the DOT's definition of the job required the worker to develop lists of prospects from telephone directories.  However, it is unclear whether the telephone solicitor job as plaintiff performed it would even be required to look at telephone directories to make lists of clients.  At plaintiff's previous job he was not required to solicit customers; rather, he answered, and sometimes returned, their calls. (Tr. 35)  Second, plaintiff contends, without citing record evidence, that telephone directory font is smaller than newsprint.  However, as pointed out by defendant, this is not necessarily true.  Most telephone directories can now be accessed by computer and their fonts can be adjusted.  Plaintiff cites no legal authority to support his argument that the VE's testimony was inconsistent with the DOT.  Additionally, his assumptions are questionable because a telephone solicitor would not necessarily be required to make lists from telephone directories and the font of telephone directories is not necessarily smaller than the font of newsprint.

Defendant also argues that plaintiff waived this argument because his representative did not question the VE or raise the alleged inconsistency during the hearing.  As with defendant's other waiver argument, however, it is unnecessary for the court to determine whether plaintiff

17

waived this argument because the argument fails on the merits.  The court should not reverse the ALJ's decision on this basis.

### D.  Whether the RFC Accommodates All of Plaintiff's Limitations

Plaintiff argues that the RFC failed to include all of his visual limitations.  In support, plaintiff points out that none of the medical opinions in the file contradict the fact that plaintiff's vision was significantly limited.  Plaintiff then lists each of the medical source opinions and cites the portions noting that his vision was significantly impaired.  This argument is flawed.  Plaintiff points to no specific limitations from the medical opinions that were not included in the RFC, and citing portions of the opinions that stand for the proposition that plaintiff's vision was "significantly limited" adds nothing.  The ALJ found that plaintiff's vision was severely impaired ,and he incorporated plaintiff's limitations in his RFC determination.

The RFC "is *the most* you can still do despite your limitations." 20 C.F.R. §§ 404.1545, 416.945 (emphasis added).  The final responsibility for deciding the RFC is reserved to the Commissioner. 20 C.F.R. § 416.927(d)(2). "As such, the ALJ bears the responsibility for assessing a claimant's RFC, based on all of the relevant evidence." *Kline v. Astrue,* No. 1:12-CV-01802, 2013 U.S. Dist. LEXIS 66287, 2013 WL 1947164, at *3 (N.D. Ohio Apr. 17, 2013), report and recommendation adopted sub nom. *Kline v. Colvin,* No. 1:12 CV 1802, 2013 U.S. Dist. LEXIS 66285, 2013 WL 1946201 (N.D. Ohio May 9, 2013) (citing 20 C.F.R. § 416.946(c)).

There is no doubt that plaintiff's vision is significantly impaired.  However, at Step Four of his evaluation, the ALJ was required to determine the *most* that plaintiff could do despite his vision impairment.  The ALJ determined that plaintiff was capable of doing his past relevant work.  In support of this finding, the ALJ noted that during the consultative exam plaintiff was

able to maneuver about the room, pick up small items, write, and open doors.  The ALJ considered records from plaintiff's medical providers stating that claimant was doing well and that his retinal status was stable. (Tr. 14)  The ALJ noted that since his surgery in early 2013 plaintiff's condition had been consistently described as stable. (Tr. 15)  The ALJ considered each of the medical opinions in the record, including the opinion of Dr. Reed.  (Tr. 15)

The ALJ also noted that claimant's daily activities were not limited as much as one would expect of a disabled individual.  Plaintiff testified that he was able to perform household chores like washing dishes, doing laundry and completing yard work.  He was able to drive during the day time and shop in stores.  He reported hobbies like hiking, bicycling, and performing yard work.  In his function report, plaintiff noted household activities such as watching television, spending time with family and friends and attending religious services. (Tr. 15)

Plaintiff supports his argument by pointing to medical records which "do not contradict" his contention that his vision is significantly impaired.  First, he argues that the opinion of Dr. Tamburro does not contradict his allegations.[8]  However, plaintiff also acknowledges that the record of Dr. Tamburro's findings is undated and unsigned and doesn't identify Dr. Tamburro at all.[9] (Tr. 374-375)  Although plaintiff seems to fault the ALJ for assigning little weight to the opinion, plaintiff does not identify which statements made by Dr. Tamburro should even have impacted the ALJ's RFC determination.  For the most part, the medical record from Dr. Tamburro simply documents plaintiff's subjective complaints.  The ALJ assigned little weight to Dr. Tamburro's opinion because it did not provide any insight into the claimant's specific visual abilities and limitations.  (Tr. 15)  Plaintiff's only argument is that Dr. Tamburro's opinion was

---

[8] ECF Doc. 18, Page ID# 571.
[9] *Id.*

consistent with plaintiff's allegations.  This argument is of no consequence to the court's review.

Plaintiff has not identified any error related to the ALJ's evaluation of the opinion from Dr.

Tamburro and no error is apparent from the undersigned's review.

Next, plaintiff complains about the ALJ's handling of the opinions of  Optometrist Cheryl

Reed.  Plaintiff argues that Dr. Reed is an "acceptable medical source."[10]  Plaintiff faults the ALJ

for failing to "mention or evaluate Dr. Reed's recommendation of closed circuit television or a

magnifier,"[11]  and then cites case law regarding a treating source's opinion.  Plaintiff contends

that the only opinions that contradicted Dr. Reed's opinion were those of the physicians who

reviewed plaintiff's file for the agency.

Regarding Dr. Reed's opinion, the ALJ stated:

Additionally, the undersigned considered the opinion of Cheryl Reed, O.D.  In
July of 2014, Dr. Reed said the claimant should avoid night driving but can drive
in daylight.  She also said the claimant can read standard 10 to 12 point print, as
long as the lighting as [sic] adequate.  Further, Dr. Reed noted the claimant should
wear glasses full time for protection and to aid in near and far distance viewing.
These statements are consistent with the examination notes, discussed above.
However, after considering the claimant's hearing testimony in which he testified
he is limited to reading for 20 minutes at one time and had difficulty reading fine
print, the undersigned finds he has some additional functional limitations.
Accordingly, Dr. Reed's opinion has been given moderate weight.

(Tr. 15)

Plaintiff argues that the ALJ should have assigned controlling weight to the opinion of

Dr. Reed.  However, plaintiff doesn't really argue that Dr. Reed should have been considered a

treating source (though he does call her that) or that the ALJ failed to provide good reasons for

assigning only moderate weight to her opinion.  In fact, plaintiff has not directly asserted an

argument regarding the ALJ's analysis of the treating source opinion.  Plaintiff's comments

---

[10] ECF Doc. 18, Page ID# 572.
[11] *Id.*

regarding the opinion of Dr. Reed are contained within his bigger argument that the RFC did not accommodate all of his limitations.  He simply attacks the ALJ's treatment of Dr. Reed's opinion by stating that only the reviewing physicians contradicted her opinions.

It is questionable whether the records from Dr. Reed can even be considered an "opinion" from a "treating source."  It appears that she met with plaintiff on only two occasions for the purpose of providing a functional low vision assessment; the first time she met with plaintiff she evaluated lighting and filters and provided loaned aids which were then evaluated when he returned them – on the second and last visit in the record.  (Tr. 423)  *See Smith v. Comm'r of Soc. Sec.,* 482 F.3d 873, 876 (6th Cir. 2007) (finding that a single examination of a patient by a doctor does not provide the requisite linear frequency to establish an "ongoing medical treatment relationship.")  Dr. Reed did not provide a longitudinal perspective of plaintiff's impairments. Moreover, she did not provide an "opinion" on plaintiff's functional limitations resulting from his vision impairment.  20 C.F.R. § 404.1527(a)(2) states that "[m]edical opinions are statements from physicians . . . that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical and mental restrictions."  Dr. Reed's letter and low vision assessment notes contain recommendations regarding magnifiers and tools that would make it easier for plaintiff to return to work.  It does not appear that she intended to provide an opinion regarding the nature and severity of his impairment or regarding his functional capabilities despite his impairment.

Even if one were to assume an error in the ALJ's handling of Dr. Reed's opinion – though I fail to see one – the error would be harmless.  The ALJ slightly discounted Dr. Reed's opinions because he found she was too liberal in her conclusions about what plaintiff could do. As the ALJ noted, Dr. Reed opined that plaintiff was capable of reading standard 10 to 12 point

print, as long as the lighting was adequate; and she would have allowed him to read smaller print

by using magnification. (Tr. 417)  The ALJ found that to be insufficiently restrictive and solved

that problem by eliminating any small print reading from the RFC.  (Tr. 13)

Plaintiff argues that the ALJ failed to analyze several of Dr. Reed's other

recommendations.  Plaintiff argues that the ALJ didn't consider that plaintiff would need to use

magnification if the lighting was inadequate; would need to use 6x binoculars for reading detail

at distances of 10 feet or greater; that plaintiff had reported that he experienced a gray curtain

and blinking when reading for more than 10 to 15 minutes; that he experienced fatigue with

regard to his vision; and that a closed circuit television was recommended.[12]  First, the ALJ is not

required to recite the medical opinion of a physician verbatim in his residual functional capacity

finding. See 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3).  This is particularly true when some of

Dr. Reed's "recommendations" were simply notes regarding plaintiff's subjective complaints.

Second, plaintiff has not demonstrated how the RFC failed to incorporate these issues.

For example, plaintiff complains about the  ALJ's omission of Dr. Reed's

recommendations regarding magnifiers and closed circuit televisions.[13]  However, close

examination of theDr. Reed's records reveals that she never opined that a closed circuit

television was *necessary* for plaintiff to return to work.  Dr. Reed did not mention the closed

circuit television in her July 24, 2014 letter, other than in reference to a functional low vision

report. (Tr. 417)  Regarding closed circuit television, that report states:

> This was David's first exposure to current desktop CCTV units.  He really liked
> being able to adjust contrast, glare, print and background color combinations
> using a CCTV unit.  The Acrobat HD provided the clarity of print, the control
> options and the large field of view that he found quite desirable in terms of
> accessing printed material.  He really liked this desk top unit.  However, if Dave
> is able to return to Summit Racing as an employee, it is unclear if the desk model

---

[12] ECF Doc. 18, Page ID# 572.
[13] ECF Doc. 18, Page ID# 572.

of the Acrobat is the most space efficient model, if the computer compatible hardware would make it a more desirable option or if the Acrobat HDE Long Arm Option might be appropriate.  We only have the desktop unit in the clinic.  A discussion with Rick Serey of the Visual Tech Connection would be helpful to decide which model is the most appropriate once a specific job is identified.  If a desktop model is viewed as the most appropriate given the job demands, the following recommendation is made:

Acrobat HD 22" - $2495.00 plus $50.00 shipping.

(Tr. 420)  It is unfair to construe this note from Dr. Reed's low vision assessment as an opinion that plaintiff required a CCTV to return to his previous work.  The report states that "**if** a desktop model is viewed as the most appropriate…"  Dr. Reed's records merely recommend a CCTV based on plaintiff's expressed preferences.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for his decision to stand. See, e.g., *Thacker v. Comm'r of Soc. Sec.,* 99 Fed. Appx. 661, 665 (6th Cir. 2004). There is no requirement to include a claimant's list of preferred accommodations.  The ALJ considered Dr. Reed's recommendations, assigned moderate weight to her opinions, and incorporated some of them into the RFC; he was not required to recite all of Dr. Reed's recommendations.

Plaintiff argues that the only two opinions which purport to contradict Dr. Reed's opinions are those of the reviewing physicians.[14]  But it is unclear how these opinions even contradict Dr. Reed's opinions.  The reviewing physicians opined that plaintiff had limited abilities with regard to his left eye.  The ALJ criticized the reviewing physicians' opinions regarding plaintiff's left eye as being too vague and providing little insight into the claimant's specific functional limitations.  Although the ALJ stated that he gave their opinions moderate weight, it appears that moderate weight was only assigned to their opinions that plaintiff should

---

[14] ECF Doc. 18, Page ID# 573.

avoid certain hazards.   Their opinions provided little other information regarding plaintiff's vision limitations and little assistance in determining his RFC.  Furthermore, the reviewing physicians' opinions were not assigned more weight than the recommendations of Dr. Reed.  The undersigned finds that the ALJ properly evaluated the medical source opinions in deciding plaintiff's RFC.  His decision should not be reversed on that basis.

### E.  Sustainability

Finally, plaintiff argues that the ALJ failed to take into account the fact that plaintiff would be unable to sustain work on a regular basis.  In support, plaintiff points to his own vision log and testimony.  For example, plaintiff points to his testimony that he was capable of reading for 20 minutes but then would need to take a break for 10 to 15 minutes. (Tr. 33, 53)  Plaintiff argues that he would be required to be off task during the 10 to 15 minutes and that, as a result of this off-task time, he is unable to do any work.[15]  Plaintiff bases this argument on his own subjective complaints.  He cites no objective medical evidence, treatment notes or opinion evidence.  The ALJ was not required to accept fully plaintiff's subjective complaints and incorporate them into the RFC.  He found plaintiff's expressions about his limitations only partly credible.  Credibility determinations regarding a claimant's subjective complaints rest with the ALJ.  See *Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir. 1987).  The RFC did incorporate some of plaintiff's subjective allegations.  For example, the ALJ limited the length of plaintiff's ability to read to 20 minutes, which was the time plaintiff indicated he was capable of reading.  (Tr. 33, 53)  However, the ALJ was not required to accept every detail of plaintiff's subjective complaints, particularly when those complaints were not borne out by the medical evidence.  The undersigned finds that the ALJ's determination of plaintiff's RFC was

---

[15] ECF Doc. 18, Page ID# 574.

supported by substantial evidence and should be affirmed.

## VII.    Recommendation

The ALJ did not err in forming his hypothetical questions to the VE, in relying on the VE's testimony, or in his determination of plaintiff's RFC.  In each of these issues the, the ALJ's actions the ALJ properly applied the governing legal standards.  Nor did he err in his evaluation of the medical opinions in the record. Segers has not demonstrated a basis upon which to reverse or remand the Commissioner's decision, and I recommend that the final decision of the Commissioner be AFFIRMED, pursuant to 42 U.S.C. §405(g).

Dated: June 19, 2017

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).